Dorothy HOOTS, individually and as mother of her children, Janelle Hoots and Jamie Hoots, Mrs. Addrallace Knight, individually and as mother and natural guardian of her children Ronald Knight, Loretta Knight, Terrance Knight, Marc Knight and Byron Knight, Barbara Smith, individually and as mother and natural guardian of her children Tawanda Smith, Tevela Smith, Joseph Smith, Wesley Smith and Eric Smith; on behalf of themselves and all others similarly situated Mae Helen Woody, Juanita Jordan,

v.

COMMONWEALTH OF PENNSYLVANIA; Edward X. Hallenberg, President of the Allegheny County Board of School Directors; the Allegheny County Board of School Directors; W. Deming Lewis, Chairman of the Pennsylvania State Board of Education; Michael Sullivan, President of the School District of the Borough of Braddock, the School District of the Borough of Braddock, Andrew Lisyak, President of the School Board of the School District of the Borough of Rankin; the School District of the Borough of Rankin, Leo Campbell, President of the School Board of the School District of the Borough of North Braddock; and the School District of the Borough of North Braddock; the Allegheny Intermediate Unit Board of School Directors and Edward X. Hallenberg as President of the Allegheny Intermediate Board of School Directors; Churchill Area School District; Edgewood School District; Swissvale Area School District; Turtle Creek Area School District.

Nos. 81–2298, 81–2787 and 81–2788.

United States Court of Appeals, Third Circuit.

Argued Dec. 18, 1981.

Decided Feb. 1, 1982.

James S. Leibman (argued), New York City, Thomas J. Henderson, Pittsburgh, Pa., for plaintiffs-appellants Dorothy Hoots, et al.

Linda R. Blumkin, Fried, Frank, Harris, Shriver & Jacobson, New York City, Anton W. Bigman (argued), Pittsburgh, Pa., for defendant-appellant General Braddock Area School Dist.

Thomas M. Rutter, Jr. (argued), Patrick J. Clair, Goehring, Rutter & Boehm, Pittsburgh, Pa., for defendant-appellee, Woodland Hills School Dist.

Before GIBBONS, HUNTER and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

This appeal raises a challenge to one aspect of the remedy ordered by the District Court for the Western District of Pennsylvania in the ten year old case of *Hoots v. Commonwealth of Pennsylvania*, No. 71–538 (W.D.Pa. filed June 9, 1971). The full history of that case is set out in Judge Hunter's opinion affirming the liability and remedy phases of this case,[1] and thus will not be repeated here. All that need be said for purposes of this appeal is that the district court found that the school district lines in the central eastern portion of Allegheny County, Pennsylvania, had been drawn in order to keep black and white students separated. *Hoots v. Commonwealth of Pennsylvania*, 359 F.Supp. 807 (W.D.Pa.1973). The district court then determined that an interdistrict remedy was appropriate, *Hoots v. Commonwealth of Pennsylvania*, 510 F.Supp. 615 (W.D.Pa. 1981), and that four formerly independent, and largely white school districts—Churchill, Edgewood, Swissvale, and Turtle Creek—should be combined into a single district along with the largely black General Braddock Area School District, *Hoots v. Commonwealth of Pennsylvania*, No. 71–538 (W.D.Pa. April 28, 1981). In its opinion and order of April 28, 1981, the district court also provided that an "Interim Operating Committee" ("IOC") should govern the new school district during the period of transition from five independent school districts to one consolidated district.

Appellants—the original plaintiffs and the defendant General Braddock Area School District—now contend that the district court's orders of June 8, 1981, and September 23, 1981, which related to the composition of the IOC and the timing of Board elections, violated the "one person, one vote" principle set out in *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Because we find the principle of proportional representation to be inapplicable to the present case, and because we find no abuse of discretion in the challenged orders of the district court, we will affirm.

I.

As noted, the district court's order of April 28, 1981, provided that "[a]s of the date of this Order," Churchill, Edgewood, General Braddock, Swissvale, and Turtle Creek would cease to exist as separate school districts and be merged into a unitary "New School District." Order of April 28, 1981, at 13.[2] The order further provided that as of June 1, 1981, the governance of the New School District would be assumed by the IOC. *Id.* at 16.

The duties of the IOC, as laid out in the district court's order, were to implement the desegregation plan, to develop a proposal for dividing the New School District into nine equal voting regions from which members of the school board would be elected in the future, to choose a permanent name for the new district, and to "adopt a budget, levy and assess taxes and perform all acts and functions necessary to enable the New School District to function properly from and after the date of organization of the Interim Operating Committee." *Id.* at 15. In setting out the functions of the IOC, the district court largely followed the provisions of Pennsylvania statutes which in general govern the consolidation of school districts.[3]

---

1. *Hoots v. Commonwealth of Pennsylvania*, 672 F.2d 1107, 1110–13 (3d Cir. 1982).

2. The district court ordered, however, that "[t]he component school districts shall continue under the governance of their respective directors until June 30, 1981." Order of April 28, 1981, at 16.

3. 24 Penn.Stat. §§ 3–303.1(c), (d), and (f) provide:

(c) The interim operating committee shall have the power and its duty shall be to meet, prepare and adopt a budget, levy and assess taxes and perform all acts and functions necessary to enable the proposed school district to function properly prior to the date of its establishment. The committee shall have the power to fill vacancies should a deficiency in membership arise due to death resignation or otherwise:

Similarly, in specifying the method of selection of members of the IOC, the district court's order was patterned after Pennsylvania law. The order mandated that the incumbent members of the boards of the five former school districts were to hold a convention on May 15, 1981, to select by majority vote nine persons from among themselves to serve on the IOC, with no more than two of the IOC members to be elected from any one former district. The terms of the IOC members, which were set at six years, were staggered so that three of the members' terms would expire on December 7, 1981, three on December 5, 1983, and three on December 2, 1985.[4]

The convention of the school directors from the five former districts was held as scheduled on May 15, 1981.[5] The membership of the IOC chosen at the convention consisted of two directors from each former district except General Braddock, only one of whose directors was elected to the IOC. The plaintiffs and General Braddock objected before the district court that General

---

Provided, however, that vacancies shall first be filled by the selection of an incumbent school director, if any.

(d) The incumbent school directors not selected for membership on the interim operating committee shall serve in an advisory capacity to the interim operating committee and to the board of school directors of the newly established school district. Such incumbent school directors may attend meetings and participate in discussions of the interim operating committee and board of school directors, but shall have no vote.

\* \* \* \* \* \*

(f) The interim operating committee or the board of school directors shall also have the power and its duty shall be to propose a name for the school district to be established. The name proposed shall be reported to the Department of Public Instruction.... When it approves a name, the Department of Public Instruction shall issue a certificate stating that the approved name has been registered as the official designation of the school district.

**4.** 24 Penn.Stat. § 3–303.1(b) provides:

(b) On or before the fifteenth day of January immediately preceding the date of establishment, such incumbent school directors of the component school districts shall be called into convention by the county superintendent of schools or, if necessary, after July 1, 1970, by the executive director of the intermediate unit and shall select by majority vote an interim operating committee composed of nine incumbent school directors. In selecting the interim operating committee, the incumbent school directors shall take into consideration the principle of proportionate representation according to population. If, by reason of failure to receive a majority vote, a tie vote, or otherwise all nine members of the interim operating committee are not selected at such convention, the county superintendent of schools shall call another convention within thirty days for the purpose of select-

ing the remaining members. If all remaining members are not selected at such second convention the court of common pleas of the proper county, upon the petition of the county superintendent of schools, shall within thirty days appoint to the interim operating committee, from the incumbent school directors, the remaining member or members and specify their terms. The decision of the convention in selecting the interim operating committee, except as hereinbefore provided, shall be final.... The members of the interim operating committee shall become and shall serve as the board of school directors of the school district on and after the date of establishment.

The district court's order departed from state law in two respects. First, it included the requirement that no more than two members of the IOC come from any one former district. Second, it contained a requirement that future elections to the school board of the new district take place on a regionalized, rather than on an at-large, basis. *Cf.* 24 Penn.Stat. § 3–303(b)(1).

**5.** On the day of the convention, the district court amended its order of April 28, 1981, to provide:

The election of members of the Interim Operating Committee ordered for May 15, 1981 by court order dated April 28, 1981, shall proceed as ordered. The terms of any members of the committee selected at this meeting shall be subject to further order of this court. The court may further order the election of one additional committee member at a future date, and also make further provisions for regional representation.

This order was issued in response to General Braddock's motion to add a tenth member to the IOC, thus providing two from each former district; to provide for an election of all nine members to the successor committee in November 1981; and to reduce the length of the terms from six years to four years in conformance with an amendment to Pennsylvania law. *See* 24 Penn.Stat. § 3–303(a).

Braddock was seriously underrepresented on the IOC. They charged that while General Braddock had one-quarter of the total population of the New School District, General Braddock was represented by only one out of the nine members of the IOC. General Braddock thus renewed its request to the district court, *see* note 5 *supra*, to amend its order of April 28, 1981, to appoint a tenth member to the IOC from General Braddock.

The district court denied this motion in an opinion and order of June 8, 1981.[6] It noted:

> Although the court feels that the result of this election is unfortunate, there is no evidence that the current members of the Interim Operating Committee are treating the General Braddock Area School District in a disparate manner in the operation of the New School District. Finally, state law provides for memberships of nine (9) school directors and the court has not been presented with any evidence that would make it necessary to temporarily disturb that provision.

Opinion and Order of June 8, 1981, at 2. On July 7, 1981, General Braddock filed the notice of appeal at No. 81–2298 from the district court's order of June 8, 1981.

The transition proceeded apace and the five former school districts went out of existence, and their school boards ceased functioning, on June 30, 1981.[7] In the meantime, the plaintiffs and General Braddock sought reconsideration of the district court's orders of April 28, and June 8, 1981. *See* Motion for Reconsideration of Order of June 8, 1981 (filed June 17, 1981, by General Braddock); Motion to Modify and Amend Order of April 28, 1981, and June 8, 1981, to Provide for Proportionate Representation (filed June 26, 1981, by plaintiffs). Both motions sought the immediate addition of a tenth member to the IOC from General Braddock.[8] In addition, the plaintiffs requested an order requiring elections in November 1981 in all nine of the voting regions that were to be formed.

The district court did not act on these motions for reconsideration immediately. In the meantime, the IOC submitted a plan dividing the New School District, which it had decided to name "the Woodland Hills School District," into nine equal voting regions, no one of which was equivalent to any former school district. The district court approved this plan on September 10, 1981, and further provided for elections in November 1981 in the three "presently unrepresented regions"—that is, the three regions in which none of the current IOC members resided. Finally, the district court renewed its order that elections for the remaining six regions take place in November 1983.

On September 23, 1981, the district court denied the outstanding motions for reconsideration, rejecting the contention of the plaintiffs and General Braddock that the proportional representation requirement had been violated:

> The argument is advanced that the people residing in the former General Braddock Area School District, which was the target of the discrimination found in this case, will be underrepresented.

On July 20, 1981, the district court also ordered that the IOC, and its members in their official capacities, be joined as defendants in No. 71–538 "solely for the purposes of remedy."

---

**6.** The district court did, however, grant General Braddock's earlier motion, *see* note 5 *supra*, to reduce the terms of the school board members from six to four years as provided by Pennsylvania law. The court therefore ordered that three members stand for election in December 1981, and the remaining six in December 1983, noting that "the pattern [that resulted] is in compliance with the [state] statutory scheme." Opinion and Order of June 8, 1981, at 2–3.

**7.** In an order of June 29, 1981, the district court directed that the solicitors of all five former districts continue to represent their respective districts for purposes of completing the litigation.

**8.** General Braddock proposed as an alternative that one of the two members elected from the school board of Edgewood, the smallest of the five districts, be replaced by a member from General Braddock. In the event that a tenth member was added, General Braddock also proposed that three members be elected in November 1981 and the remaining members in November 1983.

Our conclusions [*sic*] is that such pleas are based on a concept that no longer exists. No former school district is entitled to any special representation on the Board of the New District; only the people in the nine (9) new electoral Regions are so entitled. The former districts were of differing sizes and populations and represented former mergers of school districts existing in various municipalities.

Unfortunately, only one director from the former General Braddock Area School District was elected to the Interim Operating Committee which became the Board of School Directors of the New District. We have previously addressed that problem and refused to intervene and an appeal has been taken from that order. That one representative resides in the Borough of Braddock and is a director until 1983. Other parts of the former General Braddock Area School District are now joined with contiguous areas of other municipalities to form the new Regions and will be represented by directors now living in those Regions. Their terms run until 1983. We find nothing fundamentally unfair in this; each Region is now represented by a Director resident therein and we will afford such Directors the presumption that they will faithfully perform their duties to both the New School District and the Regions they represent without regard to any irrelevant considerations of the former school districts.

Order of September 23, 1981, at 2–3.

The plaintiffs and General Braddock then took the appeals at 81–2787 and 81–2788, which are now before this court. Subsequently, on November 3, 1981, the elections in the "unrepresented" regions were held. As the newly elected directors were scheduled to take office on December 7, 1981, the Woodland Hills School Board is apparently now composed of three elected members and six carryovers from IOC, each of whom resides in the region he or she represents. Under the district court's order, these six members of the new Board will remain until November 1983, when elections are held in the remaining six voting regions and the transition from five independent school districts to a unitary district is complete.

## II.

Plaintiffs and General Braddock argue rather broadly before this court that the district court's orders of April 28, June 8, and September 23, 1981, violated the equal protection principle of "one person, one vote" embodied in *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and *Hadley v. Junior College District*, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970). It will be useful, however, to clarify at the outset what is and what is not at issue in these appeals.

It is clear that the district court's orders of April 28, 1981, and June 8, 1981, in which it called for a convention to elect the members of the IOC and then refused to modify the results of that convention when only one General Braddock school director was elected, are not at issue here. In effect, the IOC has been replaced by the Board of School Directors of the Woodland Hills School District, which the district court created by approving the restructuring of the district into nine equal voting regions on September 10, 1981.[9] Objections that General Braddock is currently underrepresented on the school board overlook the fact that by the district court's order of September 10, 1981, the school district is composed of nine voting regions of approximately equal size, and not of the five former districts which ceased to exist as of the order of April 28, 1981.

The only issue properly before this court, then, concerns the district court's handling of the timing of elections to the Woodland Hills Board of School Directors. The conclusion that this is the real issue—and not

9. Thus, despite plaintiffs' argument to the contrary, *see* Brief of Plaintiffs-Appellants in No. 81–2787, at 18, the appeal at No. 81–2298, which challenged the district court's order of June 8, 1981, is now moot.

the lack of proportional representation alleged to have resulted from the convention of May 15, 1981 [10]—is bolstered by the character of the relief sought by plaintiffs: a remand to the district court with a direction to order elections in the other six voting regions as soon as possible. Brief of Plaintiffs-Appellants in No. 81-2787, at 23.[11] Put most specifically, the question before this court is whether there was a constitutional violation, or an abuse of discretion, in the district court's decision to order immediate elections in the three "unrepresented" regions and to postpone elections in the other six regions until November 1983, rather than ordering immediate elections in all nine regions. We hold that there was not.

### A.

◼ Both plaintiffs and General Braddock argue that *Hadley v. Junior College District*, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970), requires a finding of a constitutional violation in the district court's order. In *Hadley*, the Supreme Court applied the proportional representation principle of *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ("one person, one vote" principle applies to state legislatures), to an election for a board of trustees for a junior college district. The Court refused to hold that "constitutional distinctions should be drawn on the basis of the purpose of the election," 397 U.S. at 54-55, 90 S.Ct. at 794-95. If the courts attempted to draw such distinctions, there would be no "judicially manageable standards" to guide the decision as to which elections are important enough to merit proportional representation and which are

not. Thus the fact that a school board is the subject of the present case does not in itself render the "one person, one vote" principle inapplicable. *See Panior v. Iberville Parish School District Board*, 498 F.2d 1232, 1235 (5th Cir. 1974) (noting that "federal courts have consistently held elected state boards of education and local school boards bound by the 'one person, one vote' standard").

Nevertheless, these cases are of little help in deciding the present appeal, for they establish only that, as *Hadley* put it, "when members of an *elected* body are chosen from separate districts, each district must be established on the basis that will insure, as far as practicable, that equal numbers of voters can vote for proportionally equal numbers of officials." 397 U.S. at 56, 90 S.Ct. at 795 (emphasis supplied). *Hadley* did not decide the question that is central to this case. *Sailors v. Board of Education*, 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967), however, did address the question whether the principle of proportional representation has any bearing on non-elective offices, and held that it does not.

In *Sailors*, the method for choosing members of the county school board was attacked as denying proportional representation. The members of the county school board were not selected by popular election, but by a convention of delegates chosen by local school boards within the county. Each school district sent one delegate to the convention, regardless of its population. Characterizing the issue as whether a state "may allow its county school boards to be appointed" rather than elected, 387 U.S. at 109, 87 S.Ct. at 1552, the Court held that it could "find no constitutional reason" why

---

**10.** "It should be noted that we have taken no exception to the September 10, 1981 Order of the District Court setting up the geographic boundaries of the new election regions or districts." Brief of Defendant-Appellant General Braddock in No. 81-2298, at 18.

**11.** General Braddock apparently does not urge immediate elections in all the remaining six districts, requesting instead a remand to the

district court "for the formation of a Board of School Directors of the New School District which accords with the principle of proportionate representation" and for entry of an order "void[ing] most acts of the present Board of School Directors as of the close of the school year on June 30, 1982," in order to present the restructured Board with a clean slate. Brief of Defendant-Appellant General Braddock in No. 81-2298, at 19.

the state could not choose to have them appointed.[12]

■ We find *Sailors* to be dispositive of the present case. As *Sailors* itself observes, the "one person, one vote" principle "cast[s] no light on when a State must provide for the election of local officials," 387 U.S. at 108, 87 S.Ct. at 1552. Nor does it in any way compel a district court, in fashioning a remedy for discrimination, to provide for immediate elections to a school board it creates as part of its remedy. The six members of the Woodland Hills School Board who reside in voting regions in which elections will not be conducted until November 1983 were appointed pursuant to an order of the district court, not popularly elected by the voters. As such, the princi-

ple of proportional representation is simply not applicable.

Plaintiffs and General Braddock reply that state law itself requires the election of school board members and conclude that that renders the proportional representation principle applicable to the present case.[13] They also rely on the Pennsylvania statute governing consolidation of school districts, which requires that "in selecting the interim operating committee, the incumbent school directors shall take into consideration the principle of proportionate representation according to population." 24 Penn. Stat. § 3–303(b).

■ Aside from the fact that it is far from clear that any provisions of state law could be said to have been violated in this case,[14] however, the fundamental defect in

**12.** *See Pitts v. Kunsman*, 251 F.Supp. 962 (E.D. Pa.) ("it is not at all clear ... that the Equal Protection clause would apply to the indirectly elected interim operating committee even if the legislature mandated that each member [selected at the convention] should represent an equal number of the population"), *modified on other grounds*, 363 F.2d 841 (3d Cir. 1966); *Elberti v. Kunsman*, 254 F.Supp. 870 (E.D.Pa.1966) (same), *remanded for dismissal for lack of jurisdiction*, 376 F.2d 567 (3d Cir. 1967). *See* note 14 *infra*.

**13.** Appellants also rely on *Morrilton School District No. 32 v. United States*, 606 F.2d 222 (8th Cir. 1979), *cert. dismissed and denied*, 444 U.S. 1050, 1071, 100 S.Ct. 992, 1015, 62 L.Ed.2d 737, 753 (1980), and *Haney v. County Board of Education*, 429 F.2d 364 (8th Cir. 1970), as support for their argument that the district court's order violated the "one person, one vote" principle. In *Morrilton* several Arkansas school districts were combined as a result of a desegregation order. On appeal, the Eighth Circuit ordered that the district court should on remand appoint a school board to govern the consolidated district "through the school year *or until such time as the schools have been fully integrated in accordance with the order of the District Court and of this Court.* 606 F.2d at 231 (emphasis supplied)." The court also held that in that particular case "[t]he election for school board members in the new consolidated district [should] ... be held at the first date upon which school board elections are regularly scheduled in the State of Arkansas *after the integration is complete" Id.* (emphasis supplied). Far from supporting the appellants' contentions, *Morrilton* would seem to indicate that while immediate popular election of school board members may be desirable in some cases, a district court is not bound by the

Constitution to order an election at the earliest practical moment if it believes—as did the district court in the present case—that its desegregation remedy will be most effectively implemented by a later election.

*Haney* may indicate a stronger preference for immediate elections; in that school district consolidation case, the Eighth Circuit directed the district court to "require the election at the earliest practicable date of a new school board for the merged district." 429 F.2d at 372. In *Haney*, however, the consolidated board that had been approved by the district court itself violated the fourteenth amendment. (The district court had ordered that the white members serve terms of a length to be decided by the board, while the black members were to come up for election at the next regularly scheduled election. *See id.* at 369.) The error obviously demanded immediate rectification, and the appeals court decided that an immediate election would be the best solution. Here, in contrast, the district court's order violates no constitutional provision, and thus presents no need for this court to rectify a constitutional error.

**14.** *Elberti v. Kunsman*, 254 F.Supp. 870 (E.D. Pa.1966), would indicate that a convention of incumbent school directors held pursuant to an ordinary school district consolidation, and which resulted in an outcome similar to that of the convention of May 15, 1981, might be held to violate state law. *See also Pitts v. Kunsman*, 251 F.Supp. 962 (E.D.Pa.) (same), *modified on other grounds*, 363 F.2d 841 (3d Cir. 1966). *Elberti's* interpretation of Pennsylvania law, however, has no bearing on this case for three reasons. First, *Elberti* has no precedential value; the district court took pendent jurisdiction over the state law claims because it found that a substantial federal claim had been

appellants' argument is that "the remedial power of the federal courts under the Fourteenth Amendment is not limited by state law," *Haney v. County Board of Education*, 429 F.2d 364, 368 (8th Cir. 1970). Thus, while the district court's order was patterned on state law and while the district court in its discretion saw fit to model its order after the provisions of the Pennsylvania statute, that statute was not binding on the district court in any respect. There was no constitutional error in the district court's decision to schedule elections in three regions in 1981 and to schedule elections for the other six in November 1983.

### B.

■ Although appellants do not directly raise the argument that the district court's decision was an abuse of discretion, they do argue that "equitable principles" dictate that the district court's order should be reversed. *See* Brief of Defendant-Appellant General Braddock in No. 81–2298, at 17–18. We find no abuse of discretion, however, in the district court's order of September 23, 1981.

In essence, plaintiffs and General Braddock argued before the district court that only one General Braddock school board member was elected to the IOC because the other former school districts objected to General Braddock's strong support for the desegregation order. They also argued that the IOC had not treated the former General Braddock district fairly in the actions that had been taken by the IOC since it assumed governance of the consolidated school district. The district court found otherwise. Though it remarked at one point that it had "a rather low regard for the Interim Operating Committee" because of its lack of enthusiasm for carrying out the consolidation, *see* Transcript of Conference of Au-

gust 6, 1981, at 34–35, the district court nevertheless held that "there is no evidence that the current members of the Interim Operating Committee are treating the General Braddock Area School district in a disparate manner in the operation of the New School District." Opinion and Order of June 8, 1981, at 2. *See also* Opinion and Order of September 23, 1981, at 2–3 (no reason not to afford Woodland Hills School Board members "the presumption that they will faithfully perform their duties to both the New School District and the Regions they represent without regard to any irrelevant considerations of the former school districts").

More generally, appellants have pointed to nothing in the record to indicate that the district court abused its discretion. Nor do we see how they possibly could. The district court found no evidence that the old General Braddock district was being treated unfairly; it made certain that each region has either a resident or an elected representative on the Board; and it decided that staggering the elections would be the most effective way to implement its desegregation order. We find no abuse of discretion in that determination.

### III.

Having determined that the appeal of the district court's order of June 8, 1981, has been rendered moot, *see* note 9 *supra*, we will affirm the district court's order of September 23, 1981.

---

raised; on appeal, this court determined that the federal claim was frivolous and remanded the case to the district court with instructions to dismiss for lack of jurisdiction. *See Elberti v. Kunsman*, 376 F.2d 567 (3d Cir. 1967). Second, *Elberti* at most would bear on the validity under state law of the district court's order of June 8, 1981, in which it refused to

take any action to place another General Braddock director on the IOC. It would have no bearing on the validity under state law of the district court's order of September 23, 1981. Third, and most significant, is the fact that the validity of a federal district court's order remedying intentional racial discrimination is determined not by state law, but by federal law.